Kordash v. United States Okay, Mr. Ginsberg. Hey, police to court. My name is Peter Ginsberg on behalf of the appellant. Good morning. Respectfully, the district judge engaged in a flawed legal analysis that has had the consequence of depriving Mr. Kordash of his right to a jury to determine whether Customs and Border Patrol officers violated state common law, and indeed not only violated state common law, but violated objective standards promulgated by the agency. Mr. Kordash's complaint alleges with detail allegations of excessive force, threat of force, allegations of prolonged confinement without any justification and without any law enforcement purpose. And those allegations constitute violations of legal standards and violations of government's promulgated standards. Here's one of the issues that troubles me the most about this case, okay, for your argument. This is your second lawsuit. Yes, Your Honor. And the first lawsuit you lost and the issues on which you lost seem to me to have collateral estoppel effect here. Collateral estoppel does not require mutuality. This isn't offensive non-mutual collateral estoppel. This would be defensive collateral estoppel. Very settled that you could do that. And it seems that if you look at our precedent in Denson, the determination in the earlier suit that the officers were acting within their discretionary authority and did not violate federal law would seem then to bar, as I understand Denson, suits against the officers and their individual capacity. What am I missing? Your Honor, Denson, I think, is the proper place to review whether there was or was not collateral estoppel. Of course, there are very prominent and I believe persuasive reasons why Denson, in fact, leads to the conclusion there is no res judicata. I mean, obviously, there are. When I talk about res judicata, I'm talking about collateral estoppel. Collateral estoppel. I apologize, Your Honor. First of all, the standards are quite different between a Bivens allegation and a Federal Tort Claims Act allegation. And what the judge in the lower court decided, and everything else is dicta, what the judge decided was that there were no objective constitutional standards by which the customs officers activities could be measured. What was decided in the earlier action was that there was no violation and there were alternative findings as well. And even if there had been, it wasn't clearly established. But it seemed to me that it was very clearly litigated that the officers were acting within their discretionary authority. That was determined in the earlier proceeding, wasn't it? What was determined was the initial stop constituted action within their authority. I thought all of them were, insofar as this individual was concerned, was litigated. Not true? There was no analysis, Your Honor, of any actions after the initial stop. The initial stop? Is the initial stop the September 23, 2017 stop? Well, it's not just the September 23 stop that constitutes the complaint. Oh, no, I'm asking when you say the initial stop. I'm just asking which one you're referring to. I apologize. The initial stop on each occasion. Oh, I see. One of the occasions involved six hours of detention and a falsified report by customs officers without any articulable factors justifying the interrogation, the taking of personal property, the cuffing of Mr. Kordash. Jensen provides a three-part analysis, I think, to determine res judicata. You mean collateral estoppel? Collateral estoppel. Was the officer authorized? Again, we're not disputing that the officers were authorized to make the initial stop. What we're disputing is whether this . . . Everything the officers was doing was within their discretionary authority, right? Respectfully, I think that's absolutely not correct, Your Honor. I think Judge Pryor's decision in Swafford may provide a worthy analysis, and it wasn't you, Your Honor, who wrote the opinion, but you were on the panel. That case involved whether when an officer takes possession of a vehicle and drives it, whether that initial decision is or is not a discretionary matter. Obviously, the answer to that is yes, but Swafford makes clear that what that officer does . . . But when you have someone coming in at the border and you stop them, you decide to detain them, you search them, the length of detention, all of those things are within the discretionary authority of a Customs and Border Patrol officer, aren't they? Absolutely not, Your Honor. The government has . . . Don't tell me what specifically happened in any of these incidents that you do not think was within the discretionary authority. The best way to analyze that respectfully, Your Honor, is to look at the government's own objective standards of what is and isn't appropriate. Detention can be no longer . . . That's a different question, Mr. Ginsburg. Whether they violated the standards, whether they . . . it's a different question from whether that kind of detention and search is within their discretionary authority. That's what border officers do, isn't it? What border officers do, and what they're legally required to do, is to exercise that discretion initially, but once the determination is made, once there are no articulable factors that could justify hour after hour after hour of interrogation, when there's not . . . That's a different argument. They have an argument that they violated the Constitution, that what they did was unreasonable. That may be, but that doesn't take them out of discretionary authority. Discretionary authority, respectfully, Your Honor, only lasts as long as the activities are reasonable and within the duty of the officer. Exercising your discretion poorly is different than not having discretion, isn't it? Right, and that's why the government promulgates subjective factors by which the actions can be measured and by which one can discern the difference between actions taken in his or her discretion and actions that go beyond that. It seems to me that these rules guide the officers in exercising their discretion, but they don't eliminate their discretion. Let me suggest this, Your Honor. If the officers were exercising their discretion, they would not have falsified their reports. They would not have purposely omitted pertinent information, such as the length of the stay, such as the taking of personal property, without any articulable law enforcement. Mr. Ginsburg, that's just not the way the law works in this area. Every time an officer stops someone for a moving traffic violation, they exercise their discretionary authority. They may engage in an unreasonable search or seizure. They may engage in excessive force, but they're acting within their discretionary authority, so we get, for qualified immunity purposes, we move then to the next step to determine whether there's a constitutional violation. If there's a violation of the Constitution, we don't say they're no longer exercising their discretionary authority. That's step one. We've already gotten past that. You see? I do see, Your Honor, and here, since we're suing the United States, the question is— You earlier sued the officers. And the judge found that there was no objective constitutional standard. And the analysis that is applied in this case is different than the analysis, and some of the facts are different than what was considered in the first case. So let's say we read the standards as specifically as you suggest. Section 4.1 states the detainees, quote, should generally not be held for longer than 72 hours in CBP hold groups or holding facilities. So how does detaining Kordash for a limited number of hours fall outside that rule? Because the 4.1 also says that the detention cannot be for any longer than is necessary. And in order to analyze whether the detention was necessary, we look at whether there were any articulable factors justifying the stay. We look at whether there was any law enforcement purpose. And the place to look is in the officer's own reports. And there's not a scintilla of justification for doing what they did. And respectfully, may provide another example. With regard to the stop of Mr. Kordash's friend, the woman from Sweden, the government passes that off by saying there's no standing. But in fact, that is evidence of the abuse. That is evidence of the fact that the officers had no law enforcement purpose. Okay, Mr. Ginsburg, you've saved four minutes for rebuttal. Let's hear from Mr. Sturgill. Thank you, Your Honor. Good morning. May it please the court, I'm Lowell Sturgill from the Department of Justice representing the United States. The district court correctly dismissed all the claims in this complaint for failure to the complaint as true. First of all, I want to, as our brief explains, the agents had statutory authority to conduct these searches under 31 U.S.C. 5317B, which allows customs officials to stop and search people at the international borders, this is important, without probable cause or reasonable suspicion. And as you know, the Supreme Court has held that lawful border searches do not require – routine border searches do not require either reasonable cause or probable cause or reasonable suspicion. I know you'll want to get back to this and we will too, but first, in your view, did the United States raise collateral estoppel in the district court? So we, in our briefs, we did refer to the district court's Bivens order and we did refer to the similarities between that order and this case and the implications of it. I don't know that we said the words. You said that the first court dismissed the Bivens claim with prejudice. This case is a rise out of an identical court of operative fact and that the results from the Bivens case should control the outcome here. You didn't use the words collateral estoppel, but that's the sum and that's it, right? That's everything you said, right? Yes, Your Honor. We think that's enough to preserve the question, but even if it's not, the court can affirm on any ground that's provided in the record and collateral estoppel, for the reasons Chief Judge Pryor has noted, is plain on the – plain as face – plain as day on the face of this case. So, and we've argued in the opening brief and the plaintiffs didn't respond to it all in their reply briefs. I think you could even take it as conceded at this point. They don't have any answer to it here today. So that's one ground on which you could rule. Again, returning to the grounds the district court provided, the district court said that all of these searches were routine border searches and routine border searches are lawful without either probable cause or reasonable suspicion. Right. So the question is whether this is a routine border search and is the length of time determinative or does it have to be something about the nature of the detention or the search? So primarily when the cases have found a non-routine search, they found that because of some kind of invasion of privacy. For example, a strip search is not a routine search. If the officers – and they don't do this – but if they were, hypothetically, to hold somebody for a long, long time and not let them have access to a bathroom or not provide them with food or water, that might – that would be a non-routine search. The Supreme Court has said that we look at whether a traveler arriving in the United States generally would, quote, expect to be detained for a particular length of time, end quote. How do we determine what length of time is to be expected at the border? Is that a question of fact? So first of all, Your Honor, the Supreme Court in Flores-Montano said that up to two hours of detention is to be expected at the border and is per se reasonable. So I think that provides a safe harbor of at least two hours. And that should take care of this case because the district court in the Bivens ruling said that the two 2018 searches, which Mr. Kordash says lasted too long, one of them was for only two hours and the other one was for two and a quarter hours. So those should come within – I thought one of them was four to six hours. So that's what plaintiff alleges. But the district court in the Bivens case found that that one was only for two hours. And that's what the CBP report says. So that should be binding as a matter of collateral estoppel. Mr. Kordash actually litigated that question in the Bivens setting and he lost and he didn't appeal. Instead, he turned around and filed a new action under the FTCA as if the first action had never occurred. And if the – Let's suppose that collateral estoppel does not apply to that question. How do we determine whether four to six hours would be expected by a traveler entering the United States? So the second guidepost is the Second Circuit's Taba decision, which said that six hours is reasonable for a person entering the United States. That was different, though, because there was a vehicle search involved. They were coming by land across the border. Here Mr. Kordash is flying into the country. So Your Honor, the Supreme Court hasn't given any kind of hard and fast rule for what is too long to be a reasonable border search. And I think so what that leaves you is a case-by-case determination. So and then – Which leads back to my question. Would that be a question of fact? So it could be in an appropriate case, but in this case it's not because what you have is two searches in 2018 and you have a finding again. I know this gets back to the collateral estoppel, but that is our – that is part of our response that these searches were found to be of two hours. Two hours is within the safe harbor, ergo you don't have to decide the hard question, which is – Right, but I think she's asking you to help her solve the hard question. So let's say we have to solve the hard question. How do we do that? So the hard question is a case-by-case analysis. Right. And again, I think – For this case. I'm sorry. So one guidepost we're offering is the Taba decision from the Second Circuit, which said six hours is enough to be – it was within the safe harbor for a routine border search. And I just – I think the other maybe helpful thing to think about is Chief Judge Pryor's opinion in the Toussaint case, which explains kind of the purpose of all of this, and that is that when people leave the country and they come back to the United States, the United States' interest as a sovereign in searching the people who are coming up, you know, searching their belongings, finding out if they're doing anything illegal, is paramount. And so that's a unique setting in which – I mean, we understand that, and that's a given, but then the question is how long is too long? What is non-routine? So I think it bears on that question, which is that the presumption is that at least if you're within the six-hour rule of Taba, then that should be, again, presumptively okay because of the government's compelling interests in, you know, protecting its borders. Now, maybe there's – if it's two days or 72 hours, that's a different question. But again, I think these cases are best – honestly, I think it's – When we're looking at how to draw the line, doesn't it depend on the circumstances? Because in Taba, the court said this is a reasonable amount of time to conduct a vehicle search. Well, it also called a routine border search that we know from this court's cases and from the Supreme Court's cases that routine border searches don't require any kind of reasonable suspicion at all. So you don't have to look at what the reasons are, and that's, again, a problem with their case. Their main argument for why this is a false arrest is that this was unjustified search. Well, reasonable searches don't require any kind of justification. So – but back to your question, I think, again, the prudent thing to do is not to reach out and try to set rules in this case for what the outer boundary could be in a situation where you've been given essentially beyond the two- and six-hour parameters we've given you. If it gets beyond that, it's case by case, and there aren't any really great guide posts for knowing what that is. So I would sort of hesitate to just jump in there and try to say something without better guideposts. It would be – that's the best response I think we can give you, and just try to decide this case. Are you or are you not arguing for a bright-line rule that up to six hours would be routine? So we would say six hours is routine based on the Tabar case, yes. Do you think it needs to be routine in order for these to survive setting aside, again, collateral estoppel? Don't you think there were specific things that the border agents were concerned about? So yes, Your Honor, that's our second argument, which is actually – and forgive me for getting back to collateral estoppel, but the district court in the Bivens case found that there was reasonable suspicion for all three of these searches, and that should be binding on Mr. Kordash as a matter of collateral estoppel. And you know the facts as well as I do, but the first – in the first incident, it took longer than the two hours for the second ones because Mr. Kordash had – was found to have falsified currency reporting reports, substantially falsifying. He first said that he was carrying $6,000 with him, and then he scribbled that out and he wrote $12,000, and well, that – he had found out he actually had $34,000. So people don't forget they're carrying $34,000 in their luggage. And the other thing is the CBP – I don't know how much you have in the bank, maybe. I don't know. That's a fair point. I wouldn't forget it anyway. I wouldn't either. On a government salary. But, you know, the CBP report also – this is important – notes that the way that money was put together. Basically, he had stacks of $100 bills that were – had 20s wrapped around them, which clearly suggested he was trying to conceal the money he was taking with him. So it took time for the CBP officials to work through this, right? They had to count the money. And this is not in the record, but I happen to know that the money counters, the electronic money counters weren't working that day. So they had to find people to come in and sort out the money and count it and make sure it's counted properly. And he also had some Colombian pesos with him. They had to be counted. But none of that was true for the February 2018 search, right? He wasn't carrying any money then. So that's correct. And what the district court said was – well, at that point, first of all, two hours is presumptively reasonable as a border search. But in the Bivens case, the court said, well, there was reasonable suspicion for that one too. Because it was within a year, and the CBP officials were working with a person who had just committed a currency violation – it's a criminal statute that he violated – and a serious violation. This statute is important that CBP uses at the point of it is to be able to address and prevent, like, drug offenses and money laundering and trafficking – international trafficking offenses. These are the highest level of importance to the government. So that's what happened in the first one. And again, if you get to the reasonable suspicion question, you don't have to, I think, even decide whether you think that was right or not. The district court in the Bivens case decided that there was reasonable suspicion for all three searches. And that should be binding on Mr. Kordash as a matter of collateral estoppel. If he didn't like that, he could have appealed instead of, like, filing a new suit. He could have brought the Federal Tort Claims Act, you know, all together, as happened in Denson, too. That's correct. So just a couple of things, and I'm not going to have time to get to all of the claims, but I do want to just say a few things. First of all, the standards for a Fourth Amendment false arrest claim and a Florida false imprisonment claim run the same, and that's the Lozman case, which is cited in our brief. So counsel's wrong to say there's some big difference between the Fourth Amendment false arrest claim that the district court addressed in the Bivens ruling and this Florida false imprisonment claim. Second, Chief Judge Pryor, you're right, the Bivens decision did actually twice specifically say that Mr. Kordash had failed to allege the violation of a constitutional right in addition to the qualified immunity ruling, and that was at pages 12 and 14 of the order. Third, I note that the complaint itself alleges that the CBP officials who conducted these were acting within the scope of their employment when they did that, and they, of course, they have to do that in order to be able to allege an FTCA suit. So that claims themselves have taken the position that these individuals were acting to serve the purposes of the United States in doing that. So and then the other sort of overall point is that we think Judge Carnes's concurring opinions in the Denson case is also another ground on which the court could reject all the claims. As Judge Denson explained, under Florida law, there is . the together . A . . . A .